UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

JOHN ALBIN,                                                                        Plaintiff,

v.                                                           Civil Action No. 3:19-cv-576-DJH-RSE

LOUISVILLE METRO GOVERNMENT
et al.,                                                                         Defendants.

* * * * *

## MEMORANDUM OPINION AND ORDER

Plaintiff John Albin and his girlfriend Amber Smith were stopped and questioned by Defendants Charles Meek and Michael Pugh, two Louisville Metro Police Department (LMPD) officers, after the officers purportedly observed Albin and Smith "exhibit[ing] several suspicious characteristics" while the latter two sat in a parked car in a residential neighborhood in Louisville. (Docket No. 28-1, PageID # 602; *see* D.N. 32, PageID # 887–89)  In less than five minutes, other officers arrived at the scene; the car in which Albin and Smith had been sitting was searched; and Albin was placed in handcuffs after police found a handgun in the car's glovebox.  (D.N. 28-6, 00:35–05:27; *see* D.N. 32, PageID # 889–90)  Albin was ultimately arrested for being a felon in possession of a firearm based on what turned out to be an erroneous entry on his criminal record suggesting that he had a prior felony conviction, and he spent eight days in jail before the charges against him were dismissed.  (D.N. 28-1, PageID # 605–07; D.N. 32, PageID # 890–91)

Albin subsequently sued Meek, Pugh, and other defendants in Jefferson Circuit Court, alleging violations of his constitutional rights under the Fourth Amendment as well as various state tort claims.  (D.N. 1-2)  The defendants removed Albin's case to federal court (D.N. 1), and Meek and Pugh now move for summary judgment "on all of [Albin's] claims" against them.  (D.N. 28,

PageID # 596)  For the reasons explained below, the defendants' motion will be granted in part and denied in part.

## I.

The following facts come from the "cit[ations] to particular parts of materials in the record" found in Meek and Pugh's summary-judgment motion (D.N. 28-1) and Albin's response (D.N. 32).  Fed. R. Civ. P. 56(c)(1)(A).

## A.

Around 12:20 p.m. on July 25, 2018, Meek and Pugh, who were sharing a patrol car, arrived at the scene of a reported break-in in a residential neighborhood on the south side of Louisville. (D.N. 28-5, PageID # 731; D.N. 32-5, PageID # 1136)  The officers learned five minutes after their arrival that two suspects—one a white male wearing all black and the other an individual wearing all red—had fled down a one-lane alley that divided the back sides of two opposing rows of houses.[1]  (D.N. 28-5, PageID # 731–32; D.N. 32-5, PageID # 1136)  Roughly fifteen minutes later, Meek and Pugh drove their patrol car a short distance down that same alley before stopping at a four-way intersection.[2]  (*See* D.N. 28-6, 00:00–00:15)

While stopped, the officers noticed about fifteen yards to their left that two people were sitting in the driver's seat and front passenger seat of a car that was parked in a driveway behind a

---

[1] According to the event chronology documenting the reported break-in to which Meek and Pugh responded (*see* D.N. 32-5), the two officers arrived at the scene at 12:20:13 p.m. and learned at 12:25:22 p.m. that two suspects were "now fleeing [southbound] in [an] alley."  (*See id.*, PageID # 1136)

[2] The Court takes judicial notice of the approximate distance covered by Meek and Pugh.  *See* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."); *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1008 (6th Cir. 2017) ("We may take judicial notice of maps [generated by Google Maps] showing the distances between . . . locations.").

nearby house.  (D.N. 28-1, PageID # 602; D.N. 28-4, PageID # 685–86)  According to Meek and

Pugh, "[t]he occupants of the vehicle exhibited several suspicious characteristics."  (D.N. 28-1,

PageID # 602; *see* D.N. 28-4, PageID # 677–78; D.N. 28-5, PageID # 733–34)  Their car "was not

running," and they "were not making efforts to exit the vehicle."  (D.N. 28-1, PageID # 602; *see*

D.N. 28-5, PageID # 734)  Looking through the parked car's back windshield, the officers also

apparently saw the person in the driver's seat make "furtive movements indicative of a person

attempting to conceal evidence or use narcotics."  (D.N. 28-1, PageID # 602; *see* D.N. 28-3,

PageID # 636; D.N. 28-5, PageID # 733, 735–36)  "[I]n [Pugh's] opinion," the "position" that the

driver's-side occupant was in "was that of someone trying to shoot up narcotics."  (D.N. 28-4,

PageID # 692)  And Meek noticed "movements around the [driver's] torso, which appeared to be

furtive to [him]."  (D.N. 28-5, PageID # 733)  After observing the parked car for about twelve

seconds, the officers exited their patrol car and approached the two individuals, who themselves

had started exiting their car.  (D.N. 28-6, 00:14–00:35; D.N. 28-7, 00:10–00:25; D.N. 32, PageID

# 887)

The two individuals in the parked car were Albin and his girlfriend, Smith.  (D.N. 28-1,

PageID # 602; D.N. 32, PageID # 887)  According to Albin, the two had driven to Smith's

brother's house "to visit with [Smith's] brother . . . and other family members."  (D.N. 32, PageID

# 887; *see* D.N. 32-1, PageID # 912)  Smith's brother's house happened to be just a few doors

down from where the reported break-in that Meek and Pugh were investigating had taken place,[3]

and "[a]lmost immediately after parking" their car "in the alley behind their destination," Albin

---

[3] According to Google Maps, the location of the reported break-in, 4150 and 4152 Hazelwood
Avenue, is roughly 350 feet, or a one-minute walk, from Smith's brother's house at 4170
Hazelwood Avenue (*see* D.N. 28-1, PageID # 601).  *See Livingston Christian Sch.*, 858 F.3d at
1008 (noting that courts may take judicial notice of distances between locations).

and Smith "noticed [Meek and Pugh] in [the] rearview mirror."  (D.N. 32, PageID # 887; *see* D.N. 32-1, PageID # 917; D.N. 32-2, PageID # 965–66)  Once he saw the officers approaching, Albin, who was sitting in the front passenger seat, exited the parked car "to see what the officers wanted."  (D.N. 32, PageID # 887; *see* D.N. 32-1, PageID # 917)  And Smith, who was sitting in the driver's seat, followed suit.  (D.N. 32-2, PageID # 967)

The ensuing encounter between Albin, Smith, Meek, and Pugh was recorded on the two officers' bodycams.[4]  (*See* D.N. 28-6; D.N. 28-7)  As Albin and Smith exited their car, Meek told the two to "hold up," and he approached Smith on the driver's side of the parked car while Pugh approached Albin on the passenger side.  (D.N. 28-6, 00:35–00:45)  Meek asked Albin and Smith whether they had noticed anyone "run[ning] through" the neighborhood, to which the two replied that they had only seen someone riding a bike down an adjacent street.[5]  (*Id.*, 00:41–00:52)  In response to questions from Meek, Albin and Smith also shared that they had "just pulled up" to visit Smith's brother and that the parked car was registered to Albin.  (*Id.*, 00:58–01:12)  After

---

[4] Albin claims that Meek and Pugh "encountered" Albin and Smith "at 12:49 p.m., approximately 24 minutes after the alleged burglary suspects had fled the area."  (D.N. 32, PageID # 893–94)  But this purported timing is not corroborated by the portions of the bodycam videos that Albin cites.  (*See id.*)  Instead, Meek's bodycam video shows that LMPD officer Joseph Richardson joined Meek and Pugh close to two minutes after the latter two officers first approached Albin and Smith.  (*See* D.N. 28-6, 02:35)  And Richardson, whose bodycam video has also been submitted as an exhibit (D.N. 28-11), arrived at the scene at 12:43 p.m., as indicated by the clock in the center console of his patrol car.  (*See id.*, 00:20–00:25)  Thus, Meek and Pugh first approached Albin and Smith closer to 12:40 p.m., or approximately fifteen minutes after first learning that the two suspected perpetrators of the reported break-in had fled down a nearby alley.  (*See* D.N. 32-5, PageID # 1136)  As explained below, the precise time when Meek and Pugh encountered Albin and Smith is relevant in assessing whether the two officers reasonably could have suspected that Albin and Smith might have been involved in the reported break-in that had occurred a few hundred feet away several minutes earlier.  (*See* D.N. 28-1, PageID # 609)

[5] When Meek asked this question, Smith was effectively boxed in between Meek, the open car door, and the car itself.  (D.N. 28-6, 00:40–00:46)  Pugh similarly positioned himself in front of Albin, who was also standing in the space between the car and the open car door.  (D.N. 28-7, 00:55–01:05)

asking to see Smith's driver's license, Meek asked her "why [she was] shaking so bad" and whether she had "just slammed that vein," to which Smith said no. (*Id.*, 01:26–01:35)  Meek then asked if there were any needles in the car or on Smith's person. (*Id.*, 01:36–01:40)  Smith admitted to having a needle in her bra. (*Id.*, 01:39–01:42)  But she added that she participated in a needle-exchange program, and after placing the needle on top of the car, Smith handed a card to Meek confirming as much. (*Id.*, 01:48–02:01; *see* D.N. 28-1, PageID # 603)  Albin and Smith were asked whether a police dog would "hit on anything in the car," to which they both replied no. (D.N. 28-6, 02:08–02:28; D.N. 28-7, 02:02–02:20)  Meek subsequently directed the two to stand behind the parked car, and Pugh returned to the patrol car to check Albin's and Smith's driver's licenses for violations.[6]  (D.N. 28-7, 02:24–02:40; *see* D.N. 28-1, PageID # 605; D.N. 28-4, PageID # 695–697)

As more police officers arrived at the scene, Meek asked Smith if there was anything in the parked car that she was not supposed to have, to which Smith replied no. (D.N. 28-6, 02:37–3:18)  Meek then inquired, "So you don't mind if we take a look, right?" (*Id.*, 03:20–03:22)  In response, Smith shook her head and gestured toward the car as if to say, "Go ahead." (*Id.*, 03:23–03:24)  Meek signaled to LMPD officer Joseph Richardson, who had arrived a few minutes earlier, to begin searching the parked car. (*Id.*, 03:24–03:45)  And as Richardson began sifting through items in the passenger-side door, neither Albin nor Smith objected in any way. (*Id.*)  Just over a minute into his search, Richardson found a handgun in the car's glovebox, which Albin claimed

---

[6] Pugh was apparently "able to run Smith and Albin through NCIC," the National Criminal Information Center, and he did not discover anything alarming about either of the latter two. (D.N. 28-1, PageID # 605; *see* D.N. 28-4, PageID # 696–97; D.N. 28-5, PageID # 752)  According to the defendants, a NCIC search can yield information about "driver's license status, warrants, and domestic violence orders," but it does not "tell" whether someone is a "convicted felon[]." (D.N. 28-1, PageID # 605; D.N. 28-4, PageID # 696–97; D.N. 28-5, PageID # 752)

as his.  (*Id.*, 04:55–05:05)  Following this discovery, Meek placed Albin in handcuffs and told him that he was being "detained" but not arrested.  (*Id.*, 05:10–05:20, 05:55–06:00)  Albin apologized for forgetting about the gun and stated that he thought he "was allowed" to keep it in the glovebox.  (*Id.*, 04:55–05:05, 05:35–05:37)  Meek confirmed that Albin was correct but then implied that Albin was being handcuffed because he had failed to "say anything" about the weapon.  (*Id.*, 05:37–05:43)

For the next ten minutes, Albin stood handcuffed behind the parked car while Meek and Pugh jointly conducted a background check on Albin to determine whether he was a convicted felon.  (*Id.*, 05:10–15:30)  During that time, Albin told Meek that he had purchased the handgun from "one of his buddies" and denied having a prior felony conviction (*id.*, 08:30–08:50); Richardson completed his search of the parked car, without reporting narcotics or other contraband (*id.*, 09:21); Pugh reported the serial number on Albin's handgun to an internal service channel and learned that the firearm was "clear" (i.e., that it had not been stolen) (D.N. 28-7, 08:13-10:21); Albin informed Pugh that he had previously faced felony charges but that those charges had been reduced to misdemeanors (*id.*, 11:10–13:00; *see* D.N. 28-6, 13:18–13:22); and Meek likewise learned from a search of Albin's criminal history in the CourtNet system—which is a "case search application for Kentucky courts" that can reveal whether someone has a felony record (D.N. 28-1, PageID # 599 n.1, 605)—that prior felony charges against Albin had either been dismissed or amended down to misdemeanor charges (D.N. 28-6, 12:12–14:20).  Meek, however, eventually found a CourtNet entry that appeared to show that Albin had previously been found guilty of a felony cocaine offense, which led Meek and Pugh to conclude that Albin could be arrested for being a felon in possession of a firearm.  (*Id.*, 14:42–15:25)  Pugh subsequently informed Albin that he was being arrested due to his prior felony conviction, which Albin insisted was a mistake

because, as he told Pugh, that particular charge had been "amended . . . down to a misdemeanor." (D.N. 28-7, 15:25–15:55)  A few minutes later, Pugh, having returned to the parked car, noticed a "loaded syringe" resting on the driver's-side floorboard—Richardson had unknowingly pulled the syringe out from under the driver's seat during his earlier search—which led to Smith being arrested as well for possessing a controlled substance.  (D.N. 28-1, PageID # 606; D.N. 28-7, 20:04; *see* D.N. 28-11, 06:13)

Albin was incarcerated following his arrest.  (D.N. 28-1, PageID # 606–07; D.N. 32, PageID # 891)  He was released eight days later after prosecutors, having learned that CourtNet had erroneously identified Albin as a convicted felon, dropped the felon-in-possession charge against him.  (D.N. 28-1, PageID # 607; D.N. 32, PageID # 891)

**B.**

Albin filed a civil action in Jefferson Circuit Court against Meek; Pugh; "Louisville Metro Government"; LMPD Chief Steve Conrad; and an "Unknown Officer," claiming that the defendants violated his rights under the Fourth Amendment and committed various state-law torts during the July 2018 encounter.  (D.N. 1-2)  The defendants removed Albin's case to this Court in August 2019.  (D.N. 1; *see* D.N. 8, PageID # 73 n.1 (noting that the "unknown officer" was "not listed as a defendant in the federal case"))  Louisville Metro and Conrad moved to dismiss Albin's claims against them for failure to state a claim, which the Court granted.[7]  (D.N. 5; D.N. 8)  Meek

---

[7] According to the caption of Albin's complaint, he asserted claims against Meek and Pugh in both their individual and official capacities.  (*See* D.N. 1-2, PageID # 8)  Meek and Pugh's summary-judgment motion does not expressly address Albin's official-capacity claims against them.  Suing Meek and Pugh in their official capacities, however, "is the equivalent of suing [their] employer," Louisville Metro Government.  *Lambert v. Hartman*, 517 F.3d 433, 439–40 (6th Cir. 2008); *see Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) (noting that "since [a] [p]olice [d]epartment is not an entity which may be sued" under § 1983, the county government was instead "the proper party to address" allegations of constitutional violations committed by the police).  And the Court concluded in its previous Memorandum Opinion and Order (1) that any state-law claims against

and Pugh, the two remaining defendants, now move for summary judgment "on all of [Albin's] claims" against them.  (D.N. 28, PageID # 596)  These include § 1983 claims alleging that Meek and Pugh (1) unlawfully seized and arrested Albin and (2) unlawfully searched his car "without [his] consent or probable cause," all in violation of the Fourth Amendment.  (D.N. 1-2, PageID # 16–19)  Albin also asserts claims of false imprisonment, intentional infliction of emotional distress, negligence, negligent supervision, and malicious prosecution.[8]  (*Id.*, PageID # 19–23)  Albin responded to Meek and Pugh's summary-judgment motion (D.N. 32), and the defendants replied (D.N. 33).

## II.

A court may grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A material fact is one that "might affect the outcome of the suit under the governing law," and a dispute about such a fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the

---

Louisville Metro must be dismissed on sovereign-immunity grounds and (2) that Albin's § 1983 claims against Louisville Metro must also be dismissed because his complaint "contain[ed] no allegation that any violation of his constitutional rights was the result of . . . a[n] [official municipal] policy or custom."  (D.N. 8, PageID # 75–76, 81)  The Court has thus already dismissed all of Albin's official-capacity claims, and it construes the present motion as one for summary judgment as to the remaining individual-capacity claims against Meek and Pugh.

[8] Meek and Pugh state in their present motion that they are moving for "summary judgment on all of [Albin's] claims" against them.  (D.N. 28, PageID # 596)  Yet their motion does not address Count VI of Albin's complaint, which asserts a claim of "negligent supervision, hiring and training."  (D.N. 1-2, PageID # 21–22)  According to Meek and Pugh, that count was "dismissed" by the Court "pursuant to [Louisville Metro and Conrad's] Motion to Dismiss."  (D.N. 28, PageID # 594 n.1)  The Court's earlier Memorandum Opinion and Order dismissed Count VI *as to Louisville Metro and Conrad*, however.  (*See* D.N. 8, PageID # 84)  And Albin expressly alleges in Count VI that "Defendant Pugh [and] Defendant Meek . . . were negligent in the supervision of each other" during the July 2018 encounter.  (D.N. 1-2, PageID # 22)  Accordingly, because Meek and Pugh do not address the merits of this negligent-supervision claim against them in their summary-judgment motion, the Court will likewise leave that claim unaddressed here.  *See* Fed. R. Civ. P. 56(a) (providing in relevant part that a party moving for summary judgment must "identify[] each claim . . . on which summary judgment is sought").

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The "ultimate question" at the summary-judgment stage is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Back v. Nestle USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

The moving party bears the initial burden of "showing the absence of a genuine issue of material fact." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014). Once this burden is met, the nonmovant "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Id.*; *see Chappell v. City of Cleveland*, 585 F.3d 901, 906 (6th Cir. 2009) ("[T]he nonmovant, in response to a properly made and supported motion for summary judgment, cannot rely merely on allegations but must set out specific facts showing a genuine issue for trial."). If the nonmovant "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact," that fact may be treated as undisputed. Fed. R. Civ. P. 56(e)(2). Moreover, summary judgment must be entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A court generally must view the evidence in the light most favorable to the nonmoving party. *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 588 (6th Cir. 2014). But where, as here, "there is 'a videotape capturing the events in question,' the court must 'view the facts in the light depicted by the videotape.'" *Green v. Throckmorton*, 681 F.3d 853, 859 (6th Cir.2012) (quoting *Scott v. Harris*, 550 U.S. 372, 378, 380 (2007)).

# III.

The Court will first address whether Meek and Pugh are entitled to summary judgment on Albin's § 1983 claims against them.  (*See* D.N. 1-2, PageID # 16–19)  A plaintiff bringing a § 1983 claim must establish (1) "that he was denied a constitutional right," and (2) "that the deprivation was caused by a defendant acting under color of state law." *Carl v. Muskegon Cty.*, 763 F.3d 592, 595 (6th Cir. 2014).  Here, Albin alleges in Count I of his complaint that Meek and Pugh, while "acting under the color of state law in their capacity as [LMPD] officers," unlawfully seized and unlawfully arrested him in violation of the Fourth Amendment during the July 2018 encounter that gave rise to this matter.  (D.N. 1-2, PageID # 17)  And in Count II, Albin claims that "[b]y searching [his] vehicle without [his] consent or probable cause," Meek and Pugh "violated [his] Fourth Amendment right to be free from an unreasonable search and seizure."  (D.N. 1-2, PageID # 19)

Meek and Pugh argue that they are entitled to summary judgment on these § 1983 claims, asserting that their conduct during the July 2018 encounter did not violate Albin's constitutional rights and that they are protected by qualified immunity.  (*See* D.N. 28-1, PageID # 600)  The defense of qualified immunity is generally available to "government officials performing discretionary functions insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Slusher v. Carson*, 540 F.3d 449, 453 (6th Cir. 2008) (internal alterations omitted) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  In order for Albin's § 1983 claims to survive summary judgment, he thus must show not only that "the facts alleged and the evidence produced, when viewed in the light most favorable to [him], would permit a reasonable juror to find that" Meek and Pugh "violated [his] constitutional right[s]," but also that those rights were "clearly established." *Schulkers v.*

*Kammer*, 955 F.3d 520, 532 (6th Cir. 2020) (quoting *Kovacic v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 724 F.3d 687, 695 (6th Cir. 2013)); *see id.* at 533 ("The plaintiff bears the burden of showing that an officer is not entitled to qualified immunity."). A constitutional right is clearly established for purposes of qualified immunity if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). Put another way, "[o]nly when 'existing precedent' places the rule at issue 'beyond debate'" will the law be considered "'clearly established.'" *Kesterson v. Kent State Univ.*, 967 F.3d 519, 524 (6th Cir. 2020) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

Accordingly, in deciding whether Meek and Pugh are entitled to summary judgment on Albin's § 1983 claims here, the Court will first determine "whether the [defendants'] actions" during their July 2018 encounter with Albin "were unconstitutional." *Slusher*, 540 F.3d 449; *see Carl*, 763 F.3d at 595 (stating that a plaintiff bringing a § 1983 claim "must establish that he was denied a constitutional right"). More specifically, the Court will evaluate (1) whether Meek and Pugh unlawfully seized Albin in violation of the Fourth Amendment when they initially stopped him and Smith; (2) whether the officers violated Albin's Fourth Amendment rights by searching his car; and (3) whether Albin's ultimate arrest for ostensibly being a felon in possession of a firearm comported with the Fourth Amendment. If the Court finds that a constitutional violation did occur, it will then determine whether the particular right that was violated "was clearly established at the time of the deprivation." *Silberstein*, 440 F.3d at 316; *see Schulkers*, 955 F.3d at 532 (noting that a court "has discretion to choose which prong of the qualified immunity inquiry to consider first").

A.      **The Initial Stop**

Proceeding sequentially through the events that comprised the July 2018 encounter between Albin and the defendants, the Court will first assess whether Meek and Pugh's initial stop of Albin was constitutional or instead, as Albin claims, an "unlawful seizure."  (D.N. 1-2, PageID # 17; *see* D.N. 32, PageID # 893–896)  In their summary-judgment motion, the defendants contend that their brief observations of Albin and Smith sitting in a parked car led them to believe that the two "were likely using and in possession of narcotics," which in turn provided the officers with the requisite reasonable suspicion to conduct an investigatory stop.  (D.N. 28-1, PageID # 610; *see id.*, PageID # 608–10)    Albin argues in response that the defendants' initial stop was unconstitutional because various facts in the record indicate that "[t]he suspicion which led" Meek and Pugh to approach Albin and Smith was based on "a mere hunch" and was therefore "unreasonable."  (D.N. 32, PageID # 896)

"The Fourth Amendment protects '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'"  *Torres v. Madrid*, 141 S. Ct. 989, 995 (2021) (alteration in original) (quoting U.S. Const. amend IV).  "The threshold question to determine if [someone's] Fourth Amendment rights were violated is whether" that person was "'seized' within the meaning of the Fourth Amendment."  *Schulkers*, 955 F.3d at 536. A "seizure" can "take the form of 'physical force' or a 'show of authority' that 'in some way restrain[s]'" a person's liberty.  *Torres*, 141 S. Ct. at 995 (alteration in original) (quoting *Terry v Ohio*, 392 U.S. 1, 19 n.16 (1968)).  And it is well established that brief "investigatory stops" by police are seizures under the Fourth Amendment.  *See Smoak v. Hall*, 460 F.3d 768, 778 (6th Cir. 2006) (describing an "investigatory stop" as a "limited type of seizure"); *United States v. Young*,

707 F.3d 598, 602–03 (6th Cir. 2012) (stating that a "[m]inor seizure" occurs when "officers . . . briefly detain a person for investigative purposes").

Here, Meek and Pugh do not dispute that they "seized" Albin when they stopped and questioned him shortly after they purportedly observed him and Smith making "furtive movements" while sitting in a parked car.[9]   (*See* D.N. 28-1, PageID # 609–10)   Instead, the defendants argue that this investigatory stop was justified by their "reasonable suspicion" that Albin and Smith were "using intravenous drugs" in the parked car.   (D.N. 28-1, PageID # 609–10)

A search or seizure ordinarily "must be supported by probable cause in order to comply with the Fourth Amendment." *Schulkers*, 955 F.3d at 537.   The Supreme Court long ago held, however, that "[p]olice may briefly stop an individual for investigation if they have a 'reasonable suspicion' that the individual has committed a crime." *Houston v. Clark Cty. Sheriff Deputy John Does 1–5*, 174 F.3d 809, 813 (6th Cir. 1999); *see Terry*, 392 U.S. at 30 (holding that a police officer may conduct an investigatory stop if he reasonably concludes "that criminal activity may be afoot").   Reasonable suspicion is "satisfied by a likelihood of criminal activity less than probable cause." *Smoak*, 460 F.3d at 778.   But it requires "[m]ore than an 'inchoate and unparticularized suspicion,'" *Northrup v. City of Toledo Police Dep't*, 785 F.3d 1128, 1131 (6th Cir. 2015) (quoting *Terry*, 392 U.S. at 27), or "an ill-defined hunch," *Houston*, 174 F.3d at 813. Rather, a police officer must have "a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Navarette v. California*, 572 U.S. 393, 396 (2014) (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)); *see Northrup*, 785 F.3d at 1131 ("[T]he officer must identify 'specific and articulable facts' of criminality.").

---

[9] As discussed below, Meek and Pugh do seemingly dispute when exactly their initial seizure of Albin began.

A court reviewing the lawfulness of an investigatory stop "must examine the 'totality of the circumstances' to determine whether reasonable suspicion existed to justify [it]." *Smoak*, 460 F.3d at 779; *see Young*, 707 F.3d at 603 ("We first ask whether there was reasonable suspicion to initiate the stop . . . ."). Reasonable suspicion "is measured by 'all of the information available to law enforcement officials at the time'" the stop took place. *Smoak*, 460 F.3d at 780 (quoting *Feathers v. Aey*, 319 F.3d 843, 849 (6th Cir. 2003)). And a reviewing court must assess "whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *Green*, 681 F.3d at 860–61 (quoting *United States v. Perez*, 440 F.3d 363, 371 (6th Cir. 2006)).

In arguing that their initial stop of Albin was lawful, Meek and Pugh claim that reasonable suspicion was "first established" when Meek learned that Smith "had a needle in her bra" and participated "in the needle exchange program," which were facts that, according to the defendants, indicated that "Smith and Albin were likely using and in possession of narcotics." (D.N. 28-1, PageID # 609–10) But an investigatory stop must be "justified at its inception." *Kansas v. Glover*, 140 S. Ct. 1183, 1191 (2020) (quoting *Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt Cty.*, 542 U.S. 177, 185 (2004)). And Meek only learned about Smith's syringe nearly two minutes after he and Pugh first approached Albin and Smith. (D.N. 28-6, 01:38–02:12) Meek and Pugh's argument thus assumes that they had not yet seized Albin and Smith at the point when Smith disclosed that she was carrying a syringe.

The defendants' assumption, however, is belied by their bodycam footage. A person is seized under the Fourth Amendment as soon as (1) "a reasonable person would not believe he or she was free to leave or disregard [an] officer's requests" and (2) the person actually yields to the officer's "show of authority." *United States v. Lewis*, 843 F. App'x 683, 688 (6th Cir. 2021).

14

Here, the encounter between Albin and the defendants started when Meek commanded Albin and Smith to "hold up" as the two exited their parked car, and Albin and Smith subsequently remained in place during the short time it took Meek and Pugh to walk up to them. (D.N. 28-6, 00:35–00:46) Within seconds, Albin and Smith were being questioned by police while each was wedged between the parked car, an open car door, and an officer standing directly in front of them. (*Id.*, 00:46–01:30; D.N. 28-7, 00:55–01:05) The officers' bodycam video thus confirms that Albin and Smith were seized practically from the outset of their encounter with the defendants and well before Meek knew that Smith was carrying a syringe. *See, e.g.*, *United States v. See*, 574 F.3d 309, 313 (6th Cir. 2009) (concluding that a suspect was seized in his car when a police officer parked a patrol car in a way that prevented the suspect from driving away); *United States v. Baldwin*, 114 F. App'x 675, 679 (6th Cir. 2004) (concluding that a seizure occurred based in part on the "police officers' tone and compulsory language suggest[ing] that they expected [two suspects] to answer their questions and fully comply with their demands"); *see also United States v. Johnson*, 631 F. App'x 299, 302 (6th Cir. 2015) (describing a district court's "conclusion regarding the point at which [a] seizure occurred" as a "legal" one). As a result, that piece of information did not render constitutional an investigatory stop that was already ongoing. *See United States v. Figueredo-Diaz*, 718 F.3d 568, 573 n.2 (6th Cir. 2013) ("Reasonable suspicion for a stop cannot logically be based on events that occur after the suspect is seized.").

Accordingly, for Meek and Pugh's initial stop of Albin to have been lawful, it must have been based on *pre-seizure* factors that collectively gave rise to reasonable suspicion of criminal activity. *See Kansas*, 140 S. Ct. at 1191 (noting that an investigatory stop must be "justified at its inception"). In their summary-judgment motion, Meek and Pugh put forth several such factors, including the facts that (1) Albin and Smith were parked close to where a reported break-in had

15

occurred and were located "in the directional area to where the suspects had [reportedly] fled"; (2) Albin was wearing black shorts and thus "partially fit the description of one of the break-in suspects"; (3) Albin and Smith's car "was not running" and the two "were not making efforts to exit the vehicle"; (4) the officers "observed several suspicious characteristics, most notably furtive movement indicative of concealment of illicit items"; and (5) "[b]oth Albin and Smith appeared to be sickly and had the unhealthy appearance of a drug user."  (D.N. 28-1, PageID # 602, 609) But as discussed below, two of these factors are subject to genuine factual disputes that cannot be resolved at the summary-judgment stage.  *See* Fed. R. Civ. P. 56(a).  And the Court cannot conclude that the remaining factors collectively provided Meek and Pugh with reasonable suspicion "that [Albin] ha[d] committed, or [wa]s about to commit, a crime."  *Northrup*, 785 F.3d at 1131.

To start, the factor that would most likely support a finding of reasonable suspicion here is Meek and Pugh's claim that they saw Albin and Smith "make furtive movements indicative of a person attempting to conceal evidence or use narcotics (D.N. 28-1, PageID # 602).  *See United States v. Caruthers*, 458 F.3d 459, 466 (6th Cir. 2006) ("Furtive movements made in response to a police presence may also properly contribute to an officer's suspicions."), *overruled in part on other grounds by Cradler v. United States*, 891 F.3d 659 (6th Cir. 2018).  But as Albin points out in his response, there is a genuine factual dispute as to (1) what exactly Meek and Pugh saw during the roughly twelve seconds they observed Albin and Smith sitting in a parked car and (2) whether the movements the officers purportedly witnessed were objectively "furtive" and thus suggestive of wrongdoing.  *See Navarette*, 572 U.S. at 396 ("[A] law enforcement officer [must] ha[ve] 'a particularized and *objective basis* for suspecting the particular person stopped of criminal activity.'" (emphasis added)).

16

Critically, the furtive movements Meek and Pugh claim to have observed cannot be seen in their bodycam videos, and their bodycams were muted during the few seconds preceding their decision to approach Albin and Smith's parked car, meaning that any conversations the officers had about what they were seeing were not captured. (*See* D.N. 28-6, 00:00–00:30; D.N. 28-7, 00:00–00:30) And the evidence in the record offers a somewhat muddled account of what Meek and Pugh actually saw through the parked car's back windshield. During his deposition, for instance, Meek stated that he saw that "the driver was leaned over" and was making "some movements around the torso, which appeared to be furtive," but it was nevertheless unclear to him "if the person was actually trying to conceal something" or instead "maybe trying to inject drugs." (D.N. 28-5, PageID # 733) Pugh, on the other hand, testified that he saw the driver in a "very prone position" that indicated that she was actively "shooting up narcotics." (D.N. 28-4, PageID # 692–93; *see id.*, PageID # 691 ("I can recall seeing [Smith] leaning down, again with an arm over and, in my opinion, doing narcotics.")) Moreover, the citation documenting Albin's arrest states that "[o]fficers observed [the] listed suspect make furtive movements as officers approached." (D.N. 28-8, PageID # 784) But Meek testified that he "didn't notice [Albin] really doing much of anything" while the latter sat alongside Smith in the parked car. (D.N. 28-5, # 734)

All in all, it is unclear what exactly a movement "indicative of a person attempting to conceal evidence or use narcotics" looks like (D.N. 28-1, PageID # 602) and whether such a movement is or could be objectively suspicious. *See Young*, 707 F.3d at 603 ("Ambiguous behavior does not give rise to reasonable suspicion because 'reasonable suspicion looks for the exact opposite of ambiguity.'"). And a jury must resolve such material factual discrepancies. *See Gerics v. Trevino*, 974 F.3d 798, 804–05 (6th Cir. 2020) (describing "probable cause" and "reasonable suspicion" as constitutional standards and concluding that "the ultimate question of

17

probable cause" is a "question of law" to be decided by a judge only if "the historical facts are undisputed"); *cf. Hale v. Kart*, 396 F.3d 721, 728 (6th Cir. 2005) ("If disputed factual issues underlying probable cause exist, those issues must be submitted to a jury for the jury to determine the appropriate facts.").

Next, Meek and Pugh's suggestion that Albin and Smith had a "sickly and . . . unhealthy appearance"—an observation that, according to the defendants, "supported their ultimate belief that" the latter two "may have been using intravenous drugs" in the parked car—is the sort of conclusion upon which reasonable jurors could disagree.  (D.N. 28-1, PageID # 609)  Indeed, based on the officers' bodycam videos, describing Albin and Smith as obvious "drug user[s]" is at best a largely subjective characterization of their appearance and at worst a patently inaccurate one.  (*See* D.N. 28-6, 00:35–00:42)  In any event, this genuine factual dispute regarding Albin's and Smith's physical appearance on the day of their encounter with the defendants must likewise be resolved by a jury, and the Court accordingly cannot determine at this stage whether or how that factor might have contributed to Meek and Pugh's reasonable suspicion that Albin and Smith were using illegal drugs.  *See Gerics*, 974 F.3d at 804–05; *Hale*, 396 F.3d at 728.

That leaves (1) Albin and Smith's proximity to the reported break-in; (2) the fact that Albin was wearing black pants on the day of the July 2018 encounter and thus "partially fit the description of one of the break-in suspects"; and (3) the fact that Albin and Smith sat in an idle car for around twelve seconds.  (D.N. 28-1, PageID # 609; *see id.*, PageID # 602, 609)  Regarding the first factor, there is very little evidence in the record suggesting that Meek and Pugh had "a particularized and objective" reason to suspect that Albin and Smith had anything to do with the reported break-in, rendering the latter two's mere proximity to the scene of that crime an especially weak basis upon which to find that the defendants had reasonable suspicion to stop and question

Albin. *Navarette*, 572 U.S. at 396; *see See*, 574 F.3d at 314 (stating that "context-based factors" that could "pertain[] to anyone" in a certain area "should not be given undue weight" in a reasonable-suspicion analysis); *cf. Illinois v. Wardlow*, 528 U.S. 119, 124 (2000) ("An individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.").  As a practical matter, the fact that Meek and Pugh encountered Albin and Smith a few hundred feet from where the break-in took place—a distance that could be walked in about a minute—a full fifteen minutes after the suspected burglars reportedly fled the scene would have suggested to a reasonable observer that those suspects were long gone by the time the defendants decided to approach Albin and Smith's parked car.  *See Baldwin*, 114 F. App'x at 680 (concluding that the presence of a fleeing suspect "strongly suggest[ed] that . . . police officers did not have a particularized suspicion to stop and detain" a person sitting in a parked car nearby); *see also United States v. Chambers*, 638 F. App'x 437, 443 (6th Cir. 2015) (concluding that a defendant's proximity to the scene of a shooting weighed in favor of finding reasonable suspicion because, among other factors, police encountered him only "*a few minutes after* the shooting occurred" (emphasis added)).  Additionally, Meek and Pugh repeatedly stated in their depositions that they decided to investigate Albin and Smith not because the circumstances objectively indicated that the two might have been involved in the break-in but rather because Albin and Smith's purportedly suspicious movements in the parked car led the officers to suspect that the two were using or trying to hide narcotics.  (*See* D.N. 28-4, PageID # 683–84, 691–93; D.N. 28-5, PageID # 733, 735)  Indeed, the citations documenting Albin's and Smith's arrests did not even mention the break-in.  (*See* D.N. 28-8, PageID # 784; D.N. 28-14, PageID # 875)  And Meek's bodycam video captured him saying more than once that the encounter with Albin and Smith was "unrelated" to that crime.  (D.N. 28-6,

39:34, 43:24, 43:51)  The reported break-in, in short, appears to have played an exceedingly minor if nonexistent role in Meek and Pugh's assessment of whether "criminal activity [was] afoot" at the time they stopped Albin and Smith, *Terry*, 392 U.S. at 30.  *See United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) ("The court cannot determine that an officer had reasonable suspicion on the basis of a factor on which th[at] officer did not actually rely.").

As for the fact that Albin's black shorts meant that he happened to "partially fit the description of one of the break-in suspects" (D.N. 28-1, PageID # 609), the Court notes that Meek and Pugh could have made that observation only after Albin exited the parked car, which he did only after the officers had already started their approach toward him and Smith.  (*See* D.N. 28-4, PageID # 691 (indicating that Meek and Pugh could at first only see Albin's head and upper torso through the parked car's back windshield); D.N. 28-1, PageID # 602 (noting that "Smith and Albin exited their vehicle immediately, *as the officers approached them* (emphasis added)))  This timing therefore suggests that Meek and Pugh had already formed and decided to act upon their suspicions of criminal wrongdoing before the color of Albin's shorts even became apparent to them.  *See Townsend*, 305 F.3d at 541 ("The court cannot determine that an officer had reasonable suspicion on the basis of a factor on which th[at] officer did not actually rely.").  In any event, such a tenuous-bordering-on-wholly-coincidental connection to the reported break-in is, at best, "a very weak indicator of criminal activity," especially in the absence of "more substantially suspicious factors" tying Albin and Smith to that otherwise largely extraneous crime  *Id.* at 544; *see See*, 574 F.3d at 314 (noting that "context-based factors that would have pertained to anyone" in a certain area "should not be given undue weight" in a reasonable-suspicion analysis).

Finally, regarding Meek and Pugh's observation that Albin and Smith sat in a parked car for roughly twelve seconds without "making efforts to exit the vehicle" (D.N. 28-1, PageID # 602),

such commonplace behavior simply cannot be interpreted as suspicious or indicative of criminal behavior. *See See*, 574 F.3d at 314 (concluding that "three men [sitting] in an unlit car in the parking lot of a housing complex" did not provide "reasonable suspicion that criminal activity was occurring"); *Baldwin*, 114 F. App'x at 680 ("The existence of a solitary parked vehicle [with two occupants inside] during the early morning hours does not present a sufficient articulable suspicion upon which to justify an arrest.").

In sum, the Court cannot conclude at this stage that Meek and Pugh's initial stop of Albin was justified by reasonable suspicion because the most salient factors the defendants cite are subject to genuine factual disputes that cannot be resolved via summary judgment, *see* Fed. R. Civ. P. 56(a), and the remaining undisputed factors, whether considered individually or in tandem, do not support such a conclusion. *See United States v. Bell*, 555 F.3d 535, 540 (6th Cir. 2009) (noting that "even where the government points to several factors" that are "valid considerations in forming reasonable suspicion," those factors "may not together provide reasonable suspicion if they are all relatively minor and subject to significant qualification" (internal alterations and quotations omitted)).

Meek and Pugh would still be entitled to qualified immunity if the constitutional right that Albin claims they violated here was not clearly established. *See Schulkers*, 955 F.3d at 532. But it is well settled that a person may not be seized unless an officer, at a minimum, has "'reasonable suspicion' that the individual has committed, or is about to commit" some sort of crime, and it is equally well settled that such reasonable suspicion must arise from "'specific and articulable facts'" suggestive of "criminality." *Northrup*, 785 F.3d at 1131 (quoting *Terry*, 392 U.S. at 27); *see Navarette*, 572 U.S. at 396; *Smoak*, 460 F.3d at 778. It is also clearly established that an individual's mere "presence in an area of expected criminal activity" cannot give rise to reasonable

suspicion on its own, *Wardlow*, 528 U.S. at 124, nor can merely sitting in a parked car in such an area, *see See*, 574 F.3d at 314.   Accordingly, whether Meek and Pugh are shielded by qualified immunity here depends on whether they in fact violated Albin's clearly established right to be free from seizures unsupported by reasonable suspicion.  *See Schulkers*, 955 F.3d at 543 (noting that the question of whether qualified immunity applied depended on whether the defendants in fact violated a constitutional right that was otherwise clearly established).   And because factual disputes material to that reasonable-suspicion question remain outstanding, they also preclude summary judgment on qualified-immunity grounds at this stage.  *See id.* at 543, 549 (concluding that the defendants were not shielded by qualified immunity because the plaintiffs had "demonstrated a triable issue as to whether each Defendant's conduct in fact violated their [constitutional] rights"); *see also Selby v. Caruso*, 734 F.3d 554, 560 (6th Cir. 2013) ("But in this case . . . facts *are* in dispute, precluding summary judgment for the defendants [on qualified-immunity grounds]." (emphasis in original)).   Summary judgment on Albin's unlawful-seizure claim is therefore not appropriate, and the defendants' motion will be denied as to that claim.

**B.     The Car Search**

The Court will next consider whether Albin's Fourth Amendment rights were violated when LMPD officers searched his car during the July 2018 encounter (*see* D.N. 1-2, PageID # 18–19), which resulted in an officer finding a handgun in the glovebox, which in turn led to Albin's arrest for being a felon in possession of a firearm.  (D.N. 28-1, PageID # 604–06; D.N. 32, PageID # 890–91)  Meek and Pugh contend that the search was lawful under the consent exception to the Fourth Amendment's warrant requirement because "[c]onsent to search the vehicle was explicitly given by Smith" and "implicitly [given] by Albin through his acquiescence and failure to object to the search at any time."  (D.N. 28-1, PageID # 613)  Albin counters that because Meek and Pugh

knew that the car was registered to him, only he "possessed actual authority to consent to the search," rendering any consent provided by Smith invalid and, by extension, any search reliant on Smith's consent unconstitutional.  (D.N. 32, PageID # 899)

"[W]arrantless searches of vehicles 'are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" *United States v. Snoddy*, 976 F.3d 630, 633 (6th Cir. 2020) (quoting *Arizona v. Gant*, 556 U.S. 332, 338 (2009)).  One such exception is the consent exception.  *See United States v. Carter*, 378 F.3d 584, 587 (6th Cir. 2004).  "It is well-settled that a person may waive his Fourth Amendment rights by consenting to a search" via words, gestures, or conduct.  *Id.*  That is, "[a]n officer with consent needs neither a warrant nor probable cause to conduct a constitutional search."  *United States v. Jenkins*, 92 F.3d 430, 436 (6th Cir. 1996).  To be valid, however, consent to a search (1) "must be voluntary" and (2) "must come from a party with apparent or actual authority over the premises" or property to be searched.  *United States v. Sheckles*, 996 F.3d 330, 346 (6th Cir. 2021).

Here, Meek and Pugh maintain that Smith granted them consent to search the parked car when, after being asked by Meek, "So you don't mind if we take a look, right?," she nodded and gestured toward the car.  (D.N. 28-1, PageID # 614; *see* D.N. 28-6, 03:20–03:25)  In response, Albin challenges the validity of Smith's consent.  He first suggests that her consent may not have been voluntary because (1) Meek "never informed . . . Smith that [she] could refuse to consent to the search of the [parked car]"; (2) Smith did not know she had a right to refuse Meek's request to search; (3) Smith had a limited educational background; and (4) the defendants "clearly caught . . . Albin and Smith off-guard as they were arriving at [Smith's brother's house]." (D.N. 32, PageID # 897–98)  It is well established, however, that the first two issues Albin raises

do not necessarily invalidate consent.  *See United States v. Collins*, 683 F.3d 697, 702 (6th Cir. 2012) ("[P]olice do not have to inform an individual of his right to refuse to consent to a search."); *United States v. Justice*, 464 F. App'x 448, 453 (6th Cir. 2012) ("While knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the *sine qua non* of an effective consent." (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973))).  And Smith's educational background notwithstanding, Meek's bodycam video confirms that Smith clearly understood the questions Meek asked her, including his request to search the parked car, and that she was not bullied or coerced in any way into granting her consent (*see* D.N. 28-6, 01:30–03:25).  *See Carter*, 378 F.3d at 588 (concluding that a defendant's consent to a police search of his motel room was voluntary in part because the defendant "was not threatened, coerced, or tricked when he chose to let the officers into his room"); *see also Green*, 681 F.3d at 859 (observing that at the summary-judgment stage, a court "must view the facts in the light depicted by the videotape").  Albin also asserts that Smith's consent was invalid because she was not the formal owner of the parked car and thus did not have the authority to permit the defendants to search it.  (*See* D.N. 32, PageID # 899)  His unlawful-search claim therefore hinges on a narrow legal question—namely, whether Smith, as the driver but not the formal owner of the car, had "apparent or actual authority over [it]" for purposes of granting consent.  *Sheckles*, 996 F.3d at 346.

Valid consent can be provided not only by the formal owner of certain property "but also by 'a third party who possesse[s] common authority over or other sufficient relationship to the premises or effects sought to be inspected."  *United States v. McCauley*, 548 F.3d 440, 446 (6th Cir. 2008) (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).  Such "common authority" by a third party "is not synonymous with a technical property interest."  *Georgia v.*

*Randolph*, 547 U.S. 103, 110 (2006); *see Matlock*, 415 U.S. at 171 n.7 ("The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements . . . ."). "Rather, the authority to consent depends on the 'mutual use of the property by persons generally having joint access or control for most purposes.'" *Scheckles*, 996 F.3d at 348 (quoting *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)). As the Sixth Circuit recently explained, this definition of "common authority" reflects the privacy-based principle that "[w]hen a party shares property with others, the entire group has a reduced expectation of privacy because the group members have 'assumed the risk that one of their number might permit the common area to be searched.'" *Id.* (quoting *Matlock*, 415 U.S. at 171 n.7). Third-party consent can be invalidated by a "physically present cotenant" who "expressly refuses consent" or objects to a search. *United States v. Johnson*, 656 F.3d 375, 377 (6th Cir. 2011); *see Randolph*, 547 U.S. at 106 ("We hold that . . . a physically present co-occupant's stated refusal to permit entry prevails [over another co-occupant's consent], rendering the warrantless search unreasonable and invalid as to [the former]."). But absent such objections, a person who has "mutual use" of or "joint access" to certain property has actual authority to consent to a search, and any subsequent search of the property based on that consent comports with the Fourth Amendment. *See Scheckles*, 996 F.3d at 348 (quoting *Rodriguez*, 497 U.S. at 181).

Here, Smith "dr[ove] the maroon Toyota Camry owned by . . . Albin" to her brother's house on the day of the July 2018 encounter with the defendants, and given that Albin accompanied her, she clearly did so with his permission. (D.N. 32, PageID # 887) Thus, because Smith undeniably had "mutual use" of and "joint access" to that car, the Court can safely conclude that she had actual authority to consent to a search of it, meaning in turn that the consent she ultimately granted to Meek was valid. *See Scheckles*, 996 F.3d at 347 ("[T]he constitutional power to consent

exists if the party has 'actual' or 'apparent' authority over the property."); *see also United States v. Eldridge*, 984 F.2d 943, 948 (8th Cir. 1993) (noting that "[t]he driver of a car has the authority to consent to a search of that vehicle," which remains true "even when some other person who also has control over the car is present"); *United States v. Dunkley*, 911 F.2d 522, 526 (11th Cir. 1990) (per curiam) ("Under the rationale of *Matlock*, a third party in sole possession and control of a vehicle clearly has the authority to consent to its search."); *cf. Jenkins*, 92 F.3d at 438 (holding that "an officer is justified in thinking that the driver [of a commercial truck] has authority to consent unless the officer knows (or is told) other information indicating that the usual assumption is incorrect"). That the car was registered to Albin and not Smith does not require a different conclusion. *Randolph*, 547 U.S. at 110 (noting that the authority to consent to a search does not depend on a "technical property interest"). Nor does the fact that Albin did not affirmatively consent to the search as well; Smith's consent alone was sufficient. *See Collins*, 683 F.3d at 702 ("Nor are police required to obtain the consent of all the occupants of a vehicle in order to search it.").

Accordingly, because Smith granted valid consent to Meek, the subsequent search of Albin's car was constitutional. *See Carter*, 378 F.3d at 587. That search thus did not violate Albin's rights under the Fourth Amendment, and Meek and Pugh are consequently entitled to summary judgment as to Albin's unlawful-search claim (*see* D.N. 1-2, PageID # 18–19). *See Carl*, 763 F.3d at 595 (stating that a plaintiff bringing a § 1983 claim must establish "that he was denied a constitutional right").

## C.   Albin's Arrest

Finally, the Court will determine whether Albin's ultimate arrest for being a felon in possession of a firearm comported with the Fourth Amendment despite the fact that Albin had no

prior felony conviction.  (*See* D.N. 1-2, PageID # 16–18)  The defendants argue that summary judgment on Albin's unlawful-arrest claim is warranted because, despite arresting him based on what turned out to be erroneous information, they reasonably believed that Albin was a convicted felon and, as a result, had probable cause to arrest him for being a felon in possession of a firearm. (D.N. 28-1, PageID # 615–17)  Notably, Albin does not defend his challenge to the lawfulness of his arrest in his response.

The Fourth Amendment "requires probable cause for an arrest."  *Barrera v. City of Mount Pleasant*, 12 F.4th 617, 620 (6th Cir. 2021).  An officer has probable cause to arrest someone when the "facts and circumstances within the officer's knowledge" at the time of the arrest are objectively sufficient "to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."  *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)); *see id.* ("An objective, not a subjective, standard applies.").  The Supreme Court has made clear, however, that "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'"  *Heien v. North Carolina*, 574 U.S. 54, 60 (2014) (quoting *Riley v. California*, 573 U.S. 373, 381 (2014)).  And "[t]o be reasonable is not to be perfect."  *Id.*; *see United States v. Strickland*, 144 F.3d 412, 415 (6th Cir. 1998) ("The Fourth Amendment, after all, necessitates an inquiry into probabilities, not certainty.").  Accordingly, "the Fourth Amendment allows for some mistakes on the part of government officials," including "searches and seizures based on mistakes of fact," so long as those mistakes are reasonable.  *Heien*, 574 U.S. at 60–61; *see Beckham v. City of Euclid*, 689 F. App'x 409, 416 (6th Cir. 2017) (concluding that a probation officer's mistaken belief that two individuals had failed to appear for court-ordered community service was a "reasonable mistake of fact" that "still justifie[d] a finding of probable cause" and, by extension, the individuals' arrest).

27

Here, the dispositive question is whether Albin's arrest by the defendants was supported by probable cause.[10]  *See Tlapanco v. Elges*, 969 F.3d 638, 652 (6th Cir. 2020) ("A showing of 'probable cause provides a complete defense to a [§ 1983] claim of false arrest.'").  And the answer to that question depends in turn on whether Meek and Pugh's mistaken conclusion that Albin was a convicted felon was nevertheless reasonable under the circumstances.  *See Heien*, 574 U.S. at 61.

The Court concludes that it was.  While reviewing Albin's criminal history on the CourtNet system—a system which, based on the evidenced presented, the defendants had no reason to believe was inaccurate or unreliable—Meek saw an entry indicating that Albin had previously been convicted of a felony cocaine offense.  (D.N. 28-1, PageID # 605–06; *see* D.N. 28-6, 14:43–

---

[10] In the § 1983 context, the lawfulness of an arrest depends on whether an officer had probable cause to effectuate that arrest.  *See, e.g.*, *Brooks v. Rothe*, 577 F.3d 701, 706 (6th Cir. 2009) ("[I]n order for a wrongful arrest claim to succeed under § 1983, a plaintiff must prove that the police lacked probable cause.").  And this appears to be the case even when an arrest is preceded by a separate Fourth Amendment violation.  Two cases from other circuit courts illustrate this point.  In *Lingo v. City of Salem*, the Ninth Circuit concluded that a § 1983 plaintiff's arrest was valid despite the fact that the information that gave the police probable cause to effectuate the arrest was obtained during an unlawful warrantless intrusion into the plaintiff's carport.  832 F.3d 953, 959 (9th Cir. 2016); *see id.* at 955–56 (explaining that police officers unlawfully entered the plaintiff's carport without a warrant, smelled marijuana, observed from their unlawful vantage point that the plaintiff had children inside her house, and then arrested the plaintiff for endangering the welfare of a minor).  The court explained that an officer does not need to "ignore facts that would give him probable cause to arrest a person merely because those facts were procured through an unlawful search" and noted more generally that whether an arrest is supported by probable cause "depend[s] on the substance of the information known to the [arresting] officer" and "not whether that information would be admissible in court."  *Id.* at 960.  Similarly, in *Martin v. Marinez*, the Seventh Circuit observed that a § 1983 plaintiff could not prevail on his false-arrest claim because police had probable cause to arrest him after finding an illegal handgun and cocaine in his car, "notwithstanding*"* the fact that these incriminating items were discovered during an "unlawful [traffic] stop."  934 F.3d 594, 598 (7th Cir. 2019); *see id.* at 599 ("[T]he fact that the evidence was the fruit of an illegal detention does not make it any less relevant to establishing probable cause for the arrest because the exclusionary rule does not apply in a civil suit under § 1983 against police officers.").  Accordingly, the possibility that Meek and Pugh's initial stop of Albin was not supported by reasonable suspicion does not automatically bring into question the lawfulness of Albin's subsequent arrest.  *See Martin*, 934 F.3d at 598–99; *Lingo*, 832 F.3d at 959–960.

14:53)   That observation led Meek and Pugh to "reach[]" what the Court agrees was "the logical and reasonable conclusion that Albin was a convicted felon."  (D.N. 28-1, PageID # 616)  And since Kentucky law prohibits convicted felons from carrying firearms, *see* Ky. Rev. Stat. § 527.040, "the facts and circumstances within [the defendants'] knowledge" at the time of Albin's arrest warranted their belief that Albin "ha[d] committed" a criminal offense.  *Barrera*, 12 F.4th at 620 (quoting *DeFillippo*, 443 U.S. at 37).  Meek and Pugh, in other words, had probable cause to arrest Albin for being a felon in possession of a firearm, *see id.*, and the fact that their otherwise reasonable conclusion regarding Albin's status as a convicted felon ultimately proved to be incorrect does not change that result.  *See Beckham*, 689 F. App'x at 415 ("That [an officer's] belief [that certain individuals had committed an offense] was ultimately incorrect is of no constitutional moment."); *Criss v. City of Kent*, 867 F.2d 259, 262 (6th Cir. 1988) ("A valid arrest based upon then-existing probable cause is not vitiated if the suspect is later found innocent."). Albin's unlawful-arrest claim therefore fails as a matter of law, *see Tlapanco*, 969 F.3d at 652, and the Court will grant the defendants' motion for summary judgment as to that claim accordingly. *See* Fed. R. Civ. P. 56(a).

## IV.

In addition to Albin's § 1983 claims, Meek and Pugh move for summary judgment on most of Albin's state tort claims on both the merits and on qualified-immunity grounds.[11]  (*See* D.N. 28-1, PageID # 617–24)  Albin does not defend any of his state-law claims in his response and is therefore "deemed to have abandoned" those claims.  *See Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("This Court's jurisprudence on abandonment of claims is clear: a

---

[11]  As mentioned above, Meek and Pugh do not address Albin's negligent-supervision claim (Count VI) against them in their summary-judgment motion.  (*See* D.N. 28, PageID # 594 n.1)

plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."). The Court "cannot grant summary judgment in favor of" the defendants, however, "simply because [Albin] has not responded" to their arguments. *Evans v. Plummer*, 687 F. App'x 434, 446 (6th Cir. 2017) (quoting *Carver v. Bunch*, 946 F.2d 451, 455 (6th Cir. 1991)). It will therefore address in turn each of the state-law claims upon which the defendants move for summary judgment.

## A.      False Imprisonment

Count III of Albin's complaint alleges that Meek and Pugh "falsely imprisoned" Albin when they "willfully," "intentionally," and "unlawfully" restrained him during the July 2018 encounter "without [Albin's] consent" or any "legal justification to do so." (D.N. 1-2, PageID # 19–20) In Kentucky, false imprisonment is defined in relevant part as "any deprivation of the liberty of one person by another or detention for however short a time without such person's consent and against his will" via restraint that was "wrongful, improper, or without a claim of reasonable justification, authority or privilege." *Banks v. Fritsch*, 39 S.W.3d 474, 479 (Ky. Ct. App. 2001).

Meek and Pugh argue that they are entitled to summary judgment as to Count III on the merits because they "had probable cause to arrest Albin," rendering his false-imprisonment claim "unfounded." (D.N. 28-1, PageID # 620) As explained above, the Court agrees that the defendants' arrest of Albin was supported by probable cause and was thus lawful. *See Banks*, 39 S.W.3d at 479 (providing that false imprisonment does not encompass restraint that is based on a "claim of reasonable justification [or] privilege"). But "*any* deprivation of" or restraint on a person's liberty that is "wrongful," "improper," or unjustified can amount to false imprisonment. *Id.* (emphasis added). And the Court concluded above that the lawfulness of Albin's initial seizure

30

cannot be determined at the summary-judgment stage. *See Smith v. Stokes*, 54 S.W.3d 565, 567 (Ky. Ct. App. 2001) ("An action for false imprisonment may be maintained where the imprisonment is without legal authority."). The defendants have thus failed to demonstrate that they are entitled to judgment as a matter of law on Albin's false-imprisonment claim. *See Laster*, 746 F.3d at 726 (stating that the moving party bears the initial burden of showing that summary judgment is warranted).

Nor are Meek and Pugh shielded by state qualified immunity. (*See* D.N. 28-1, PageID # 617–19) Under Kentucky law, "[q]ualified official immunity applies to the negligent performance by a public officer or employee of (1) discretionary acts or functions . . . (2) in good faith; and (3) within the scope of the employee's authority." *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001); *see Smith v. Norton Hosps., Inc.*, 488 S.W.3d 23, 31 (Ky. Ct. App. 2016) (confirming that an official can defend against a false-imprisonment claim and other intentional torts on the ground of state qualified immunity). Meek and Pugh's qualified-immunity defense fails on the second prong. A plaintiff can overcome a qualified-immunity defense by demonstrating that a "discretionary act was not performed in good faith." *Yanero*, 65 S.W.3d at 523. And "bad faith" for purposes of qualified immunity in Kentucky "can be predicated on a violation of a constitutional, statutory, or other clearly established right which a person in the public employee's position presumptively would have known was afforded to a person in the plaintiff's position, i.e., objective unreasonableness." *Id.*

As explained above, whether the defendants violated Albin's clearly established rights under the Fourth Amendment when they initially seized him cannot be resolved at the summary-judgment stage. *See Northrup*, 785 F.3d at 1131 (noting that the Fourth Amendment "prevent[s] the police from stopping . . . individuals in the absence of 'reasonable suspicion' that the individual

has committed, or is about to commit, a crime"); *Selby*, 734 F.3d at 560 (noting that "unresolved disputes of fact" can preclude summary judgment on qualified-immunity grounds). "Consequently," because Meek and Pugh have "failed to satisfy the good-faith prong" at this point, they are "not entitled to qualified official immunity under state law." *Browning v. Edmonson Cty.*, 18 F.4th 516, 531 (6th Cir. 2021); *see id.* (holding that an officer who tased a § 1983 plaintiff in violation of clearly established federal law was not entitled to qualified official immunity under Kentucky law).

**B.     Intentional Infliction of Emotional Distress**

In Count IV of his complaint, Albin claims that Meek and Pugh "acted intentionally and/or recklessly toward [Albin]" in a way that caused him to sustain severe emotional distress.  (D.N. 1-2, PageID # 20)  The defendants argue that this claim of intentional infliction of emotional distress (IIED) should be dismissed because Albin has failed to establish "any of the requisite elements" of that tort (D.N. 28-1, PageID # 621), and the Court agrees.

To recover under an IIED claim in Kentucky, "a plaintiff must prove" that (1) "the wrongdoer's conduct" was "intentional or reckless"; (2) such conduct was "outrageous and intolerable in that it offend[ed] against the generally accepted standards of decency and morality"; (3) there was a "causal connection between the wrongdoer's conduct and the emotional distress"; and (4) "the emotional distress" suffered by the plaintiff was "severe." *Burgess v. Taylor*, 44 S.W.3d 806, 811 (Ky. Ct. App. 2001).  Albin seemingly pleads each of these elements in his complaint.  (*See* D.N. 1-2, PageID # 20)  But to survive summary judgment, he "must do more than rely merely on the allegations of h[is] pleadings." *Chappell*, 585 F.3d at 912.  Indeed, Albin's allegations that the defendants' "conduct was outrageous and extreme" and caused him "severe" emotional distress are precisely the sort of "[c]onclusory statements unadorned with supporting

facts" that are "insufficient to establish a factual dispute that will defeat summary judgment." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)); *see Laster*, 746 F.3d at 726 (insisting that a nonmovant must "*show specific facts* that reveal a genuine issue for trial" in order to survive summary judgment (emphasis added)).   At bottom, by failing to defend his IIED claim in his response, Albin has likewise failed to show facts "sufficient to establish the existence of . . . element[s] essential to" that claim "and on which [he] will bear the burden of proof at trial," and the defendants are entitled to summary judgment on that claim as a result.  *Celotex Corp.*, 477 U.S. at 322.

**C.    Negligence**

Albin asserts a negligence claim against Meek and Pugh in Count V of his complaint (D.N. 1-2, PageID # 21), and the defendants offer several reasons why summary judgment on that claim is warranted.

They first maintain that Albin's negligence claim "is not viable" because he also asserts claims of false imprisonment, IIED, and malicious prosecution.  (D.N. 28-1, PageID # 624)  But the cases the defendants cite for this proposition simply underscore that a state-law negligence claim cannot be premised on a police officer's use of excessive force because such conduct "constitutes the intentional tort of battery." *Turner v. Hill*, No. 5:12-cv-195, 2014 WL 549462, at *10 (W.D. Ky. Feb. 11, 2014); *see, e.g., id.* ("To permit a separate claim for negligence premised on the same [use of excessive force] by the officer is logically and doctrinally unsupportable."). And the defendants point to no authority explaining why Albin's assertion of a false-imprisonment or IIED claim here similarly bars him from bringing a negligence claim.

The defendants also contend, however, that "[t]here has been no breach of duty[,] and the other required elements of the tort of negligence are not present" (D.N. 28-1, PageID # 624), and

the Court agrees that summary judgment is warranted on this basis.  A plaintiff bringing a negligence claim must show that the defendant breached an applicable duty of care, *see Pathways, Inc. v. Hammons*, 113 S.W.3d 85, 88 (Ky. 2003), and here, Albin specifically alleges that Meek and Pugh breached their duty "to protect [Albin] from harm and to treat him fairly and lawfully" when they "fail[ed] to perform proper due diligence before unlawfully arresting [Albin] and unlawfully seizing his property."  (D.N. 1-2, PageID # 21)  Yet to the extent that Albin's negligence claim hinges on the alleged unlawfulness of his arrest by the defendants, it fails for the simple reason that the Court concluded above that the arrest comported with the Fourth Amendment.  And to the extent that Albin is claiming that, irrespective of the lawfulness of his arrest, Meek and Pugh nonetheless negligently "fail[ed] to perform due diligence" prior to arresting him, he has failed to allege—let alone show for purposes of surviving summary judgment—how exactly the officers' "due diligence" during the July 2018 encounter was inadequate.  *See Chappell*, 585 F.3d at 906 ("[I]n response to a properly made and supported motion for summary judgment, [a nonmovant] cannot rely merely on allegations . . . .").  Nor has he pointed to anything in the record that might suggest that Meek and Pugh's reliance on an erroneous CourtNet entry was unreasonable.  For purposes of his negligence claim, then, Albin has failed "to show specific facts that reveal a genuine issue for trial," *Laster*, 746 F.3d at 726, and the Court will accordingly grant the defendants' motion for summary judgment as to that claim.

**D.    Malicious Prosecution**

Finally, Count VII of Albin's complaint asserts a malicious-prosecution claim against Meek and Pugh (D.N. 1-2, PageID # 22–23), and the defendants move for summary judgment on that claim because, they contend, "the requisite elements of the tort are not present."  (D.N. 28-1, PageID # 623)

34

A malicious-prosecution claim "may be established" in Kentucky "by showing," among other elements, that the defendant "initiated, continued, or procured a criminal or civil judicial proceeding" against the plaintiff "without probable cause." *Martin v. O'Daniel*, 507 S.W.3d 1, 11 (Ky. 2016). Thus, "a Kentucky claim for malicious prosecution . . . cannot survive when the police had probable cause" to initiate the criminal proceeding that the plaintiff alleges was tortious. *Lester v. Roberts*, 986 F.3d 599, 612–13 (6th Cir. 2021). Here, the Court concluded above that Meek and Pugh's arrest of Albin was supported by probable cause. And until prosecutors learned that "CourtNet [had] inaccurately identified Albin as a convicted felon" (D.N. 28-1, PageID # 607), his eight-day incarceration, while no doubt unfortunate and undeserved, was likewise supported by probable cause. *See Lester*, 986 F.3d at 608 (noting that pretrial detention is lawful under the Fourth Amendment if the government "has 'probable cause to believe [the defendant] committed a crime'"). Thus, because his arrest and eight-day detention were supported by probable cause, Albin's malicious-prosecution claim fails as a matter of law, *see id.* at 612–13, entitling the defendants to summary judgment on that claim.

## V.

For the reasons set forth above, and the Court being otherwise sufficiently advised, it is hereby

**ORDERED** as follows:

(1)     The defendants' motion for summary judgment (D.N. 28) is **GRANTED** as to Albin's § 1983 unlawful-arrest claim in Count I of his complaint, as well as his claims in Counts II, IV, V, and VII. The motion is **DENIED** as to Albin's § 1983 unlawful-seizure claim in Count I of his complaint and as to his claim in Count III.

(2)     In accordance with the Court's March 19, 2020 Order (D.N. 9), this matter is **REFERRED** to Magistrate Judge Regina S. Edwards for a status conference to set a final pretrial and trial schedule for the remaining claims.

March 30, 2022

David J. Hale, Judge
United States District Court